# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| **HUNTINGTON NATIONAL BANK,** | : | |
| Plaintiff, | : | Case No. 2:12-CV-1035 |
| v. | : | JUDGE ALGENON L. MARBLEY |
| **GUISHARD, WILBURN & SHORTS, LLC,** et al., | : | Magistrate Judge Mark R. Abel |
| Defendants. | : | |

## OPINION AND ORDER

This matter is before the Court on Plaintiff Huntington National Bank's ("Huntington" or "Plaintiff") Motion for Temporary Restraining Order and Preliminary Injunction ("Motion"), (Doc. 2), against Defendants Guishard, Wilburn & Shorts, LLC ("GWS"), Allen Pendergrass, Joseph Gray, Clyde Parks, and Nathan Pendergrass (collectively "Defendants"). Upon this Court having held a preliminary injunction hearing on November 26, 2012, this matter is now ripe for decision. For the following reasons, Huntington's motion for a preliminary injunction is **GRANTED** in part and **DENIED** in part. The Court hereby **ORDERS** as follows:

a) Defendants are preliminarily enjoined from making any transaction in the GWS Account, as defined below, until resolution of this action.

b) Defendants are preliminarily enjoined from spending, using, dissipating, or otherwise transferring funds withdrawn from the GWS Account or funds otherwise relating to the fraud described below, until resolution of this action.

c) Plaintiff is permitted and authorized to stop transactions in and prevent Defendants' access to the GWS Account or any other Huntington accounts held in the name of Defendants GWS, Allen Pendergrass, Joseph Gray, and/or Nathan Pendergrass, including but not limited to checking, savings, certificate of deposit, mortgage, personal credit line, credit card, debit card, brokerage, or any other financial account.

1

  d) Plaintiff is not permitted or authorized to stop transactions in other Huntington accounts held in the name of Defendant Clyde Parks.

  e) Plaintiff is not permitted to open, hold or secure the contents of any Huntington safe deposit box held in Defendants' names.

  f) Defendants shall immediately deposit with the Clerk of Court the withdrawals made from the GWS Account or funds otherwise relating to the fraud described below, until resolution of this action.

## I. BACKGOUND

*A. Factual History*

In 2003, Defendant Guishard, Wilburn & Shorts, LLC ("GWS") – a Delaware company with its principle place of business in Georgia – opened a deposit account with Huntington Bank bearing account number XXXXXXX3672 (the "GWS Account"). (Doc. 3, Ex. A (GWS Account opening documents).) The account opening documents for the GWS Account list "Allen Pendergrass, President" as the authorized signatory. Huntington video surveillance indicates that, since February 2012, Defendants Allen Pendergrass, Clyde Parks ("Parks"), and Joseph Gray ("Gray"), each transacted in the GWS Account onsite at Ohio branch locations. (Doc. 3.) Allen Pendergrass is a Georgia resident and Parks and Gray are residents of Ohio. (Doc. 1, ¶¶ 13-16.)

In February 2012, according to Huntington bank statements, the account balance in the GWS Account was $76.99. (Doc. 3, ¶ 4) Since that time, fifty-one (51) federal checks totaling $806,358.51 have been deposited in the GWS Account. (Doc. 1, Ex. A (table of deposited federal checks); Doc. 3, Ex. B (redacted federal checks).) Huntington estimates that these federal checks, which included tax refund checks, social security payments and other reoccurring federal benefit payments, account for approximately 97% of all funds deposited into the GWS Account

in 2012. (Doc. 3, Ex. C (GWS Account statements)).) Each deposited federal check was purportedly endorsed to GWS by the proper payee. Although these checks were deposited at Huntington branches in Ohio, the vast majority were issued to Georgia residents. (Doc. 3, Ex. B.)

Shortly after the federal checks were deposited, numerous large withdrawals were made from the GWS Account. Over the course of seven months, $435,343.20 was drawn on the GWS Account by Allen Pendergrass, $16,500 was drawn by Gray, and $9,100.00 was drawn by Nathan Pendergrass, a Georgia resident. Together, these withdrawals total more than $460,000. In addition, $40,000 in electronic debits were made from the GWS Account by unknown recipients. (Doc. 3, Ex. C.)

Huntington has now received reclamation requests from the federal government related to the majority of the federal checks deposited in the GWS Account. "Reclamation" is a process by which the federal government demands that a federally charted bank repay funds received from the federal government. The reclamation process is initiated by the individual who has not received the check. To date, Huntington has received 27 reclamation requests on the federal checks deposited in the Huntington account. In each of these, the original payee must aver that he or she never received the federal check at issue, never endorsed the check, did not give anyone else authority to deposit the check, and did not receive any benefit from the check. (Doc. 4, ¶¶ 4-6, 9, 11, Ex. A (copies of reclamation claims).)

In August of 2012, Huntington was contacted by an attorney representing two taxpayers, Matthew and Handte and Carly "Joy" Cain-Handte, who were supposed to receive a $194,769.00 tax refund check. Huntington confirmed that the Handte's tax refund check was deposited in the GWS Account on July 27, 2012. The Handtes indicated that they had never given GWS or any other person authority to deposit the check. Instead, they asserted the endorsements on the check

3

were forged. On or about September 5, 2012, Huntington requested that Allen Pendergrass present documents which authorized GWS to deposit the Handtes' federal tax refund check. Via email, Mr. Pendergrass sent copies of what he asserted to be the Handtes' driver's licenses in order to establish GWS's authorization. Upon examination, Huntington's security team determined that these driver's licenses were forged.

Based on the 27 reclamation requests, interactions with the Handtes' attorney, and Allen Pendergrass's presentation of apparently forged identification documents, Huntington now believes that all 51 federal checks deposited in the GWS Account were likely stolen, had forged endorsements, and were deposited without the authorization of the proper payees. Huntington believes that Allen Pendergrass was the principal architect of the alleged check-cashing scheme and that Gray, Parks and Nathan Pendergrass were active co-conspirators.

Huntington is required to repay funds pursuant to a valid reclamation claim irrespective of whether the financial institution is able to collect from entities that have improperly cashed the check. Huntington has already repaid 19 reclamation claims totaling $169,733.65. Eight (8) additional reclamation claims totaling $295,185.66 are outstanding. (Doc. 1, Ex. C (table of reclamation requests).) Currently, the GWS Account funds available to cover reclamations total $293,671.31. (Doc. 3, Ex. C.) Based on the reclamation claims made to date, this results in a shortfall of $171,238.00. Huntington anticipates that it will receive reclamation claims on the remaining 24 federal checks, requiring Huntington to repay an additional $512,000.00.

The evidence suggests that neither GWS nor the individual named defendants are likely to be able to repay Huntington's reclamation outlays, other than out of the funds obtained through the cashing of these federal checks. GWS appears to be a company without assets. Prior to the deposit of the federal checks at issue, the GWS Account contained less than $80.00.

In addition, Plaintiff's counsel avers that, when attempting to serve process on GWS, Huntington found that the address it has on file for the business is a vacant. Defendants Allen Pendergrass and Clyde Parks appear to have limited individual holdings with Huntington. Mr. Allen Pendergrass allegedly has a mortgage loan with Huntington with approximately $12,000 in equity and an outstanding balance of approximately $38,000. Mr. Parks has three individual accounts with an aggregate balance of approximately $6,000, as well as a safe deposit box. (Doc. 9.) Mr. Parks asserted before the Court that the funds in these accounts consist largely of an inheritance from his late father, which he uses to support himself, daughters, and a sister on social security disability. Nothing is known about the assets of Gray or Nathan Pendergrass.

Parks asserts through his attorney that he was unaware of any fraud or scheme, that he knew Allen Pendergrass through a prior business relationship, and that his sole involvement here was to deposit a few checks at Mr. Pendergrass's request – without knowing anything about their nature or origin – in exchange for a nominal fee. After conferring with Parks' counsel and conducting its own investigation as to Parks' Huntington accounts, Plaintiff has withdrawn its requests for injunctive relief related to Parks' personal holdings at Huntington. Plaintiff maintains its claims against Parks for his part in the alleged check cashing scheme.

Gray too asserts that he had no knowledge of or intent to commit theft or fraud. (Doc. 16.) Gray contends that he worked for Allen Pendergrass from 1999 to 2001 at National Unclaimed Funds, an asset recovery business which he believes to be the predecessor to GWS. (Doc. 16, Ex. B.) He asserts that recovery companies generally secure funds from a debtor on behalf a creditor in exchange for approximately 33% of the funds recovered. It is typical, he says, for a debtor to remit payment by signing over federal checks to the recovery company. Gray avers that Mr. Pendergrass asked Gray to deposit endorsed federal checks into the GWS

account beginning in April 2012 – transactions which Gray purportedly thought to be "nothing more than standard asset recovery procedures." (*Id*. at 1.) Because the depository tasks were "identical to tasks [Gray had] performed while at National Unclaimed Funds," Gray contends that "nothing appeared out of the ordinary" and, thus, he had no reason to suspect the checks were stolen or their endorsements forged. (*Id*. at 2.) Gray received payment for his services of 3% of the check amount or 10% of what he purportedly presumed to be Mr. Pendergrass's share of the recovery. (*Id*. at 1.) In his pleadings, Gray contends that he would be willing to return any portion of funds he received that is subject to a reclamation claim. (Doc. 16 at 2-3.) Gray's self-serving allegations are set forth in largely unsupported pleadings and affidavits that have not been subject to cross-examination.

## *B. Procedural History*

Huntington filed its Complaint, (Doc. 1), on November 8, 2012. Plaintiff asserted claims against all defendants for fraud, violations of Ohio's Uniform Commercial Code (UCC), civil conspiracy, and violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act. Plaintiff filed its Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction the same day.

After so filing, Plaintiff attempted repeatedly to affect service of process on GWS and the named defendants. Service of process was executed as to Nathan Pendergrass on November 14 and as to Gray on November 15. Parks accepted service through his attorney on November 17. Formal service of process was never executed as to GWS or Allen Pendergrass because the current addresses listed for both appear to be vacant and the process server was unable to locate Allen Pendergrass. Plaintiff's counsel, however, avers that Allen Pendergrass did receive actual notice of these proceedings because (1) the filings were emailed to an electronic address from

which Mr. Pendergrass had previously communicated with Huntington, and (2) Plaintiff's counsel spoke by telephone to a man who identified himself as Mr. Pendergrass, but then, upon hearing the reason for counsel's call, pronounced expletives and asserted that the caller had the wrong number.

This Court held a Local Rule 65.1 conference on Plaintiff's motion for TRO on November 14. Both Huntington and Parks were present and had the opportunity to be heard.

On November 15, Huntington's TRO was granted, (Doc. 15), and Defendants were temporarily enjoined and restrained from: (1) "[m]aking any transaction in the GWS Account until further order of this Court;" and (2), "[s]pending, using, dissipating, or otherwise transferring funds withdrawn from the GWS Account or funds otherwise relating to the redemption of the federal checks listed in Exhibit A of the Complaint." Plaintiff was permitted and authorized to "stop transactions in and prevent Defendants' access to the GWS Account or any other Huntington accounts held in the name of Defendants GWS, Allen Pendergrass, Joseph Gray, Clyde Parks, and/or Nathan Pendergrass, including but not limited to checking, savings, certificate of deposit, mortgage, personal credit line, credit card, debit card, brokerage, or any other financial account." The TRO remains effective until this Court's ruling on Huntington's request for a preliminary injunction.

Plaintiff's has requested that a preliminary injunction from this Court grant the following relief (Doc. 8):

>   (a)     Defendants may not make any transactions in the Guishard Wilburn & Shorts Account ("GWS Account") as described in the Complaint, until further order of this Court;
>
>   (b)     Huntington may stop transactions in and prevent Defendants' access to any other Huntington accounts held in the name of Defendants Guishard Wilburn & Shorts, Allen Pendergrass, Joseph Gray, Clyde Parks, and/or Nathan Pendergrass, including but not

limited to checking, savings, certificate of deposit, mortgage, personal credit line, credit card, debit card, brokerage, or any other financial account;

(c) Plaintiff is permitted to open, through drilling or otherwise, any Huntington safe deposit box held in the name of Defendants Guishard Wilburn & Shorts, Allen Pendergrass, Joseph Gray, Clyde Parks, and/or Nathan Pendergrass;

(d) Plaintiff is permitted to secure and hold the contents of any Huntington safe deposit box held in the name of Defendants Guishard Wilburn & Shorts, Allen Pendergrass, Joseph Gray, Clyde Parks, and/or Nathan Pendergrass;

(e) Defendants are enjoined from spending, using, dissipating, or transferring funds withdrawn from the GWS Account or funds otherwise relating to the fraud, as described in the Complaint;

(f) Defendants shall immediately deposit with the Clerk of Court the withdrawals made from the GWS Account or funds otherwise relating to the fraud, as described in the Complaint, until resolution of this action;

(g) Defendants shall refund to Huntington the withdrawals made from the GWS Account or funds otherwise related to the fraud, pursuant to Huntington's right to revoke, rescind, or seek restitution for the fraudulent transactions.

The preliminary injunction hearing was held on November 26, 2012. On the morning of the hearing, the Court received a pro se filing from Gray, which is styled as an answer to Plaintiff's Complaint. Gray appeared at the Court in person to make his filing, but failed to attend the hearing, although he had knowledge of the hearing. In his cover letter to the Court, Gray acknowledged that

> [T]he Plaintiff's attorney Albert Lin, Ice Miller, LLP, provided notice of the hearing scheduled for today [November 26, 2012] at 10:00 AM, on Thursday afternoon, November 15, 2012. I was provided additional information and complaint documents on November 16, 2012.

Parks appeared at the hearing represented by his attorney. This Court has received no additional briefing from any of the Defendants.

## II. STANDARD OF REVIEW

A preliminary injunction is a remedy used by the court to preserve the status between the parties pending trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). When determining whether to grant a preliminary injunction, this Court must balance the following four factors: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

These factors are to be balanced against one another other and should not be considered prerequisites to the grant of a preliminary injunction. *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998). As an extraordinary remedy, a preliminary injunction is to be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

## III. LAW AND ANALYSIS

*A. Likelihood of Success on the Merits*

In its Complaint, Huntington predicates its prayer for injunctive relief on four causes of action against Defendants.[1] Each will be evaluated in turn to determine Huntington's likelihood of success on the merits.

---

[1] Huntington's Complaint asserts "Injunctive Relief" as a fifth cause of action. An injunction, however, is not a cause of action, but a remedy. *MEMC Electronic Materials v. Balakrishnan*, No. 2:12-cv-344, 2012 WL 3962906, at *5 (S.D. Ohio Sept. 11, 2012) (citing *Hammond v. Citibank, N.A.*, No. 2:10–CV–1071, 2011 WL 4484416, at *11 (S.D. Ohio Sept. 27, 2011*)). See*

### 1. Fraud (Claim 1)

Count I of the Complaint alleges claims in common law fraud against all Defendants. Under Ohio law, the elements of fraud are: "(1) a representation (or concealment of a fact when there is a duty to disclose) (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance." *Volbers-Klarich v. Middletown Mgt., Inc.*, 929 N.E.2d 434, 440 (Ohio 2010) (citing *Burr v. Stark Cty. Bd. of Commers.*, 491 N.E.2d 1101 (Ohio 1986)).

Here, the evidence indicates that Allen Pendergrass and Joseph Gray knowingly deposited stolen federal checks with forged endorsements on behalf of GWS, with the intent to convert the deposited funds for their own benefit and that of Nathan Pendergrass. Although Gray's knowledge is disputed, the allegations in his favor are largely unsupported and thus have limited weight. Huntington justifiably relied on Defendants' false representation that GWS was properly entitled to the 51 federal checks deposited in the GWS Account, and permitted Defendants to draw on the deposited funds on that basis. As a result, Huntington is liable to the federal government for the wrongfully converted checks and must repay the reclamation claims from its own funds. Huntington is therefore likely to succeed on the merits of its fraud claims against Defendants GWS, Allen Pendergrass, Gray, and Nathan Pendergrass.

---

*also Reyes v. Wilson Mem. Hosp.*, 102 F.Supp.2d 798, 801 n.1 (S.D. Ohio 1998) (noting that claim for injunction "does not constitute a separate legal claim for relief"). This Court therefore need not consider this cause of action in its likelihood of success evaluation.

The evidence presented, however, does not indicate that Parks harbored the requisite intent to support a claim of fraud. Parks claims he did not know that the checks he deposited at Allen Pendergrass's request were stolen and fraudulently endorsed, and Huntington offers no evidence to the contrary. Furthermore, the receipt of nominal reimbursement for his role as a currier does not support an inference that Parks knew he was engaging in illegal behavior. Accordingly, Huntington is unlikely to succeed in its claims against Parks.

### 2. Recovery Under the U.C.C. (Claim 2)

Count II of the Complaint asserts claims under Ohio's Uniform Commercial Code (UCC). The Ohio Revised Code, § 1303.56(A), provides that a person who obtains payment from a check warrants to the payor that: (1) he is entitled to enforce the check; (2) all signatures, including endorsements, are authentic and authorized; (3) the instrument has not been altered; and (4) the check is not subject to any other defense or claim by any other party. Section 1303.56(B) provides than an entity that takes a check in good faith may recover damages for a breach of these warranties "an amount equal to the loss suffered as a result of the breach," including the amount of the check, expenses, and lost interest.

The evidence indicates that Defendants stole the 51 federal checks deposited in the GWS Account and forged the proper payees' signatures to endorse the instruments to GWS. In negotiating and obtaining payment from these checks at Huntington, Defendants GWS, Allen Pendergrass, Nathan Pendergrass, and Joseph Gray made all the warranties described in O.R.C. § 1303.56(A). Huntington accepted the more than $800,000 in stolen checks in good faith and permitted these Defendants to withdraw more than $450,000 of the deposited funds. Twenty-seven (27) of these checks have been subject to reclamation claims by the federal government to date. Huntington's reclamation liability constitutes loss resulting from Defendant's breach of

warranty and entitles Huntington to recover the amounts of the stolen checks, expenses, and lost interest. Huntington is therefore likely to succeed in its UCC claims against GWS, Allen Pendergrass, Nathan Pendergrass and Gray.

Parks, however, does not appear to have represented that he was entitled to funds from the checks negotiated at Huntington, nor is there evidence that he obtained payment from those instruments. Accordingly, Plaintiff is unlikely to succeed on its UCC claims against Parks.

### 3. Civil Conspiracy (Claim 3)

Count III of the Complaint asserts civil conspiracy claims against all defendants. "The Ohio Supreme Court has defined a civil conspiracy as 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.' " *In re National Century Financial Enterprises, Inc.*, 504 F.Supp.2d 287, 326 (S.D. Ohio 2007) (quoting *Kenty v. Transamerica Premium Ins. Co.,* 650 N.E.2d 863, 866 (Ohio 1995)). To establish a claim for civil conspiracy, Huntington must show: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy.'" *Rosy Blue, NV v. Lane*, 767 F.Supp.2d 860, 868 (S.D. Ohio 2011) (quoting *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.,* 219 F.3d 519, 534 (6th Cir. 2000)).

The "malicious combination" element of civil conspiracy "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *Aetna,* 219 F.3d at 538 (quoting *Gosden v. Louis,* 687 N.E.2d 481, 496 (Ohio Ct.App. 1996)). "The element of agreement ... is nearly always established by circumstantial evidence, as conspirators seldom make records of their illegal agreements." United States v. Short, 671 F.2d 178, 182 (6th Cir. 1982). "With respect to the level of

12

agreement that must be established, this court has stated that '[a]ll that must be shown is that ... the alleged coconspirator shared in the general conspiratorial objective....'" *Aetna*, 219 F.3d at 538 (quoting *Hooks v. Hooks,* 771 F.2d 935, 944 (6th Cir. 1985)).

As described above, Defendants likely committed fraud and violations of the UCC, both of which constitute independent unlawful acts for the purposes of establishing civil conspiracy. Moreover, such acts resulted in injury to Huntington in the form of liability for hundreds of thousands of dollars in federal reclamation claims.

Furthermore, the evidence presented shows that, at minimum, Allen Pendergrass, Nathan Pendergrass, Gray and Parks were involved in the deposit and/or withdrawal of stolen federal checks. With respect to Allen Pendergrass, Nathan Pendergrass and Gray, each drew down thousands of dollars – and, in the case of Allen Pendergrass, hundreds of thousands of dollars – from the GWS Account, thereby directly and personally benefiting from the wrongfully converted funds. Although Gray's knowledge of the scheme is disputed, this circumstantial evidence supports an inference of common design to commit an unlawful act. As such, Huntington is likely to succeed on its civil conspiracy claims against GWS, Allen Pendergrass, Gray, and Nathan Pendergrass.

The extent to which Parks was aware of the unlawful nature of the GWS check-cashing scheme, however, is disputed. Parks claims he did not know that the checks he deposited at Allen Pendergrass's request were stolen and fraudulently endorsed, and Huntington offers no evidence to the contrary. Furthermore, other than a nominal fee for his role as a currier – which suggests payment for an errand more than windfall to a co-conspirator – there is no evidence that Parks personally benefited from the other Defendants' fraud. In the absence of even circumstantial evidence that Parks shared the "general conspiratorial objective" of the other

participants in the check-cashing scheme, *Aetna*, 219 F.3d at 538, the Court finds that Huntington is unlikely to succeed on the merits of its civil conspiracy claim against Parks.

### 4. Civil RICO, 18 U.S.C. §§ 1962(b), (c) & (d), and § 1964(c) (Claim 4)

Plaintiff also asserts claims under the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. §§ 1962(b), (c), (d) and § 1964(c). Section 1962(b) provides that it is unlawful "for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." Section 1962(d) makes it unlawful for a person "to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Section 1964(c) states that a cause of action is available to anyone "injured ... by reason of a violation of section 1962." *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *Beck v. Prupis*, 529 U.S. 494, 500 (2000).

To establish a violation of § 1962, Plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (two or more acts) (4) of racketeering activity. *Sedima*, 473 U.S. at 496, n.14. An "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. *Fleischhauer v. Feltner*, 879 F.2d 1290, 1296 (6th Cir. 1989) (quoting 18 U.S.C. § 1961(4)). As defined in 18 U.S.C. § 1961(1), "racketeering activity" includes bank fraud, 18 U.S.C. § 1344, and interstate transportation of knowingly stolen property, 18 U.S.C. § 2314.

Here, the GWS LLC and the named defendants constitute an enterprise under the meaning of the RICO statute. In knowingly depositing 51 stolen federal checks with forged endorsements and negotiating those checks at Huntington, and withdrawing those funds for personal benefit, the conduct of Defendants GWS, Allen Pendergrass, Gray and Nathan Pendergrass satisfies RICO's definition of bank fraud. In addition, because many of the federal checks at issue were knowingly stolen from out-of-state payees, and the substantial portions of the fraudulently obtained funds appear to have been transferred out of state, such conduct also constitutes interstate transport of stolen property within the meaning of the RICO statute. Moreover, the frequency and repetition of these Defendants' conduct in this case evinces a pattern of such racketeering activity. Again, although Gray's knowledge of the illegal activity is in dispute, the unsupported allegations in his favor carry limited weight. The Court therefore finds that Huntington is likely to succeed on the merits of its RICO claims against GWS, Allen Pendergrass, Gray and Nathan Pendergrass.

As discussed above, however, Huntington is not likely to establish that Parks harbored the requisite scienter to meet the "racketeering activity" element of the RICO statute. Therefore, Plaintiff is unlikely to succeed on its RICO claims with respect to Parks.

*B. Irreparable Harm*

In the Sixth Circuit, "defendants' concealment and dissipation of assets" likely obtained through fraud constitutes irreparable harm for the purposes of issuing a preliminary injunction. *NCR Corp. v. Feltz*, 983 F.2d 1068, 1993 WL 11876, at *2 (6th Cir. Jan. 21, 1993). *See also Concheck v. Barcroft*, No. 2:10-cv-656, 2010 WL 4117480, at *3, *2 (S.D. Ohio Oct. 18, 2010) ("Plaintiff is likely to suffer irreparable harm if [Defendants] are not required to submit funds … they still retain to the safekeeping of the Court" where evidence "indicat[es] that [Defendants]

are willing to dispose of or conceal remaining funds rather than return them" and the funds at issue are "likely contracted by fraud").

Here, the evidence presented as to Defendants' withdrawal of nearly $450,000 of funds from the GWS Account to date, the vacancy of the premises at GWS's purported current place of business, and Allen Pendergrass's apparent unwillingness to accept service of process indicate a willingness to conceal or dissipate assets. Accordingly, the Court finds that Huntington will likely suffer irreparable harm if Defendants are permitted to dissipate the funds in the GWS account and "are not required to submit funds … they still retain to the safekeeping of the Court." *Concheck*, 2010 WL 4117480 at *3. Furthermore, the Court finds that Huntington will likely suffer irreparable harm if Allen Pendergrass, Nathan Pendergrass and Gray are permitted to dissipate and/or conceal any personal holdings they may have with Huntington, as each appears to have personally withdrawn substantial sums from the GWS Account.

## C. Harm to Others

In evaluating the harm to third parties, the Court must "balance the harm a plaintiff would suffer if its request for a preliminary injunction were denied with the harm the defendants would suffer if they were to be preliminarily enjoined." *MEMC*, 2012 WL 3962906 at *5 (quoting *Novak v. Farneman*, No. 2:10-cv-768, 2010 WL 4643002, at *6 (S.D. Ohio Nov. 9, 2010)).

As described above, Huntington is likely to succeed on the merits of its claims against GWS, Allen Pendergrass, Nathan Pendergrass and Gray. As such, the harm to Huntington should it be unable to recover the hundreds of thousands of dollars expended to satisfy federal reclamation claims far exceeds the harm to these defendants from being unable to retain funds obtained through fraudulent means. Thus, with respect to these defendants, the balance of harms weights in favor of granting Plaintiff's requested preliminary injunction.

With respect to Parks, however, there is no indication that he received more than a nominal financial benefit from the check-cashing scheme at issue, and his limited personal funds are used to support himself, his daughters, and a sister on social security disability. As such, the harm to Parks from being unable to access personal funds not obtained through fraud is substantial. The harm to Huntington of being deprived of the few thousand dollars which Mr. Parks appears to have in his possession is far more limited. The balance of harms therefore weighs against granting Huntington's requested injunctive relief as to Parks.

*D. Public Interest*

The final factor also supports a determination that a preliminary injunction would be appropriate with respect to Defendants GWS, Allen Pendergrass, Gray and Nathan Pendergrass. The fraudulent enterprise at issue involved the theft and conversion of federal tax refund and federal benefit checks. Defendants' fraud delayed taxpayers and social security beneficiaries alike from timely getting the monies to which they were entitled, and forced the federal government to expend resources in order to recover those funds. Arguably the issuance of a preliminary injunction in this case will promote the public interest by "deter[ing] others from orchestrating [such] fraudulent …schemes." *Concheck*, 2010 WL 4117480, at *3.

## IV. CONCLUSION

The balancing test factors all weigh in favor of Plaintiff's request for a preliminary injunction, except with respect to its requests which relate to freezing or accessing Huntington accounts or holdings, including safe deposit boxes, held in the name of Defendant Clyde Parks. Plaintiff's request for preliminary injunction is therefore **GRANTED** in part and **DENIED** in part. The Court hereby **ORDERS** as follows:

a) Defendants are preliminarily enjoined from making any transaction in the GWS Account, as defined below, until resolution of this action.

b) Defendants are preliminarily enjoined from spending, using, dissipating, or otherwise transferring funds withdrawn from the GWS Account or funds otherwise relating to the fraud described below, until resolution of this action.

c) Plaintiff is permitted and authorized to stop transactions in and prevent Defendants' access to the GWS Account or any other Huntington accounts held in the name of Defendants GWS, Allen Pendergrass, Joseph Gray, and/or Nathan Pendergrass, including but not limited to checking, savings, certificate of deposit, mortgage, personal credit line, credit card, debit card, brokerage, or any other financial account.

d) Plaintiff is not permitted or authorized to stop transactions in other Huntington accounts held in the name of Defendant Clyde Parks.

e) Plaintiff is not permitted to open, hold or secure the contents of any Huntington safe deposit box held in Defendants' names.

f) Defendants shall immediately deposit with the Clerk of Court the withdrawals made from the GWS Account or funds otherwise relating to the fraud described below, until resolution of this action.

**IT IS SO ORDERED.**

                                              **s/ Algenon L. Marbley**
                                              **Algenon L. Marbley**
                                              **United States District Judge**

**Dated: November 26, 2012**